IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* PAUL J. SOLOMON,<br><br>      Plaintiff,<br><br>VS.<br><br>LOCKHEED MARTIN CORP., et al.,<br><br>      Defendants. | §§§§§§§§§§§ Civil Action No. 3:12-CV-4495-D |

MEMORANDUM OPINION
AND ORDER

In this *qui tam* action, defendants' motions for summary judgment present the question whether plaintiff's claims are precluded under the pre-2010 public disclosure bar of the False Claims Act ("FCA"). Concluding that the public disclosure bar precludes the court from exercising jurisdiction over plaintiff's FCA claims, the court grants the summary judgment motions and dismisses this action with prejudice.

I

This is a suit by relator Paul J. Solomon ("Solomon") against defendants Lockheed Martin Corporation ("Lockheed") and Northrop Grumman Systems Corporation ("Northrop") under the FCA that arises from the Joint Strike Fighter F-35 program ("JSF Program").[1] Lockheed was awarded a cost-plus-award-fee contract for the JSF Program and

---

[1]In deciding defendants' summary judgment motions, the court views the evidence in the light most favorable to Solomon as the summary judgment nonmovant and draws all reasonable inferences in his favor. *See, e.g., Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v.*

hired Northrop as a subcontractor for various aspects of production. The contract was structured so that Lockheed received a base fee for production and received awards based on performance at the conclusion of various award periods throughout the life of the contract. The contract required that defendants use an Earned Value Management System ("EVMS") to oversee performance and report findings to the government. Defendants and the government annually developed EVMS Surveillance Plans to guide supervision and audits. The contract also required that Lockheed regularly update its estimates for the total cost of the project. If Lockheed met specified goals for cost and performance, it was eligible for awards at the conclusion of each award period.

Northrop employed Solomon during this time period. He conducted EVMS compliance reviews, also known as "surveillance audits," for the JSF program. Through these audits, Solomon discovered that Lockheed was mismanaging aspects of its budget to conceal cost overruns in its periodic estimates. Lockheed shifted money from its Management Reserve budget—funds set aside for unanticipated work—to reduce cost overruns. This resulted in misrepresented cost estimates and performance reports filed with the government.

Solomon reported his findings to auditors from the Defense Contract Management Agency ("DCMA"). The DCMA initiated an EVMS compliance review of Lockheed's Fort Worth facility in late August 2007. Solomon assisted the DCMA with this investigation. In

---

*Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

November 2007 the DCMA released a report detailing Lockheed's violation of EVMS and other guidelines, including that Lockheed had "[used] management reserve to alter internal and subcontractor performance levels and overruns." Compl. ¶ 22.  In March 2008 the Government Accountability Office ("GAO") issued a report in which it reached similar conclusions to those of the DCMA.

Solomon was reassigned from the JSF program in late August 2007.  After he was reassigned, Solomon received an unsigned Memorandum of Agreement ("Memorandum") that he contends shows that defendants conspired to misrepresent their cost overruns to the government. The Memorandum detailed a process for diverting Management Reserve budget funds to conceal cost overruns.  Solomon did not disclose the Memorandum to the government while he worked at Northrop.

Solomon retired from Northrop in August 2008.  Following his retirement, he continued to alert government officials to his findings regarding the JSF program.  He wrote various members of Congress, Department of Defense officials, and the GAO, requesting that each further investigate the JSF program and reform EVMS implementation and oversight. In 2011 Solomon first forwarded the Memorandum to the government via Senator John McCain and the GAO.

Solomon filed this *qui tam* action on November 7, 2012.  Counts I through VI of his FCA complaint ("complaint") allege that defendants filed false claims with the government by concealing the true costs of the JSF program.  On October 3, 2014 the government gave notice that it was declining to intervene.  On March 20, 2015 Solomon filed his first amended

complaint ("amended complaint").

Defendants initially moved to dismiss Solomon's claims, but the court ordered that the parties move instead for summary judgment. *See United States* ex rel. *Solomon v. Lockheed Martin Corp.*, 2015 WL 6956578, at *5 (N.D. Tex. Nov. 10, 2015) (Fitzwater, J.) ("*Solomon I*"). Defendants now move for summary judgment. Solomon opposes the motions.

II

The court must first decide whether its jurisdictional analysis must be based on Solomon's complaint or his amended complaint, which adds a claim against defendants for fraudulent inducement.

Although generally an amendment to a complaint relates back to the complaint itself, an amendment cannot "be used to create jurisdiction retroactively where it did not previously exist." *Jamison* ex rel. *Jamison v. McKesson Corp.*, 649 F.3d 322, 328 (5th Cir. 2011) (quoting *Aetna Cas. & Sur. Co. v. Hillman*, 796 F.2d 770, 775 (5th Cir. 1986) (internal quotation marks omitted). "If [Solomon's] complaint did not establish jurisdiction . . . his amendments cannot save it." *Id.* The court is therefore confined to the claims in Solomon's complaint—which alleged false claims of award fees and conspiracy to submit those false claims—to decide whether it has jurisdiction.

III

Under 31 U.S.C. § 3730(e)(4)—known as the FCA "public disclosure bar" or "jurisdictional bar"—a district court is precluded from exercising jurisdiction over certain FCA actions that involve publicly disclosed allegations.[2] The parties do not dispute that this case is governed by the version of the FCA in effect prior to the 2010 amendments, because all of Solomon's claims concern pre-2010 events. The pre-2010 version of the FCA public disclosure bar provided:

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [Accountability] Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

---

[2]In 2010, as part of the Patient Protection and Affordable Care Act, the public disclosure bar was amended by eliminating the jurisdictional language and modifying other language. *See* 31 U.S.C. § 3730(e)(4) (2012); *see also United States* ex rel. *Lockey v. City of Dallas*, 576 Fed. Appx. 431, 435 n.1 (5th Cir. 2014) (per curiam); *United States* ex rel. *May v. Purdue Pharma L.P.*, 737 F.3d 908, 915-18 (4th Cir. 2013) (explaining changes to FCA public disclosure bar under 2010 amendments, and refusing to apply 2010 version retroactively to action alleging pre-amendment fraud commenced after effective date of amendments ), *cert. denied*, ___ U.S. ___, 135 S.Ct. 2376 (2015). All the cases cited and discussed in this memorandum opinion and order address the pre-2010 version of the FCA.

31 U.S.C. § 3730(e)(4)(A)-(B) (2006).

The question whether the "public disclosure bar" or "jurisdictional bar" applies is decided under a summary judgment standard. *See Solomon I*, 2015 WL 6956578, at *2 ("[a] challenge under the FCA jurisdictional bar is necessarily intertwined with the merits and is, therefore, properly treated as a motion for summary judgment." (quoting *Jamison*, 649 F.3d at 326) (internal quotation marks omitted)). Generally, when a summary judgment movant will not have the burden of proof on a claim at trial, it can obtain summary judgment by pointing the court to the absence of evidence on any essential element of the nonmovant's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once it does so, the nonmovant must go beyond its pleadings and designate specific facts demonstrating that there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). Applied to § 3730(e)(4)(A), however, this standard would require that the plaintiff prove a negative—that public documents do not exist. Accordingly, under the summary judgment standard applicable here,

> the defendants must first point to documents plausibly containing allegations or transactions on which [plaintiff's] complaint is based. Then, to survive summary judgment, [plaintiff] must produce evidence sufficient to show that there is a genuine issue of material fact as to whether his action was based on those public disclosures. In evaluating that question, we view the evidence [plaintiff] produces in the light most favorable to him.

*Jamison*, 649 F.3d at 327 (footnote omitted); *see also United States* ex rel. *Lam v. Tenet Healthcare Corp.*, 287 Fed. Appx. 396, 399, 402 (5th Cir. 2008) (explaining that district

court denied defendant's 2006 motion to dismiss under FCA jurisdictional bar because "there was an issue of fact on [the] question" whether plaintiffs were "original sources," and upholding district court's granting of defendant's 2007 motion for summary judgment because plaintiffs were not "original sources").

## IV

The court must first decide whether defendants have met their initial burden to point to documents plausibly containing allegations or transactions on which Solomon's complaint is based, in other words, documents that plausibly demonstrate that counts I through VI are "based upon [a] public disclosure," so as to trigger § 3730(e)(4)(A) (2006).[3]  Defendants have submitted evidence of two such potential public disclosures: a November 2007 DCMA EVMS Compliance Report, and a March 2008 GAO Report.

### A

If a *qui tam* action is "even partly based upon public allegations or transactions," the jurisdictional bar applies. *United States* ex rel. *Fried v. W. Indep. Sch. Dist.*, 527 F.3d 439, 442 (5th Cir. 2008) (citations and internal quotation marks omitted).  In determining whether claims are based upon such allegations, the court asks "whether one could have produced the substance of the complaint merely by synthesizing the public disclosures' description of a scheme." *Little v. Shell Expl. & Prod. Co.*, 690 F.3d 282, 293 (5th Cir. 2012) (quoting *Jamison*, 649 F.3d at 331) (internal quotation marks omitted).  But

---

[3]Because counts I through VI are underlying claims of Solomon's count VII conspiracy action, the court considers them first.

> [c]orrelation in detail is not the only question. It can be that disclosures provide specific details about the fraudulent scheme and the types of actors involved in it such that the defendant's misconduct would have been readily identifiable. An irreducible minimum is that the disclosures furnish evidence of the fraudulent scheme alleged.

*Id.* (quoting *Jamison*, 649 F.3d at 329-30) (internal quotation marks and brackets omitted). In other words, the public disclosure need not be identical to the action. Instead, a claim is "based upon" the disclosure "when both sets of allegations are substantially similar." *Stennett v. Premier Rehabilitation, LLC*, 479 Fed. Appx. 631, 634-35 (5th Cir. 2012) (per curiam) (citing *United States* ex rel. *Branch Consultants, LLC v. Allstate Ins. Co.*, 668 F.Supp.2d 780, 796-97 (E.D. La. 2009)).

B

Having identified the documents on which defendants rely, the court now turns to Solomon's complaint. The court considers together counts I through VI, which center on alleged misuse of Lockheed's Management Reserve budget funds over three award periods between September 2006 and October 2007. Solomon alleges that his audits revealed that, in each award period, Lockheed impermissibly shifted funds from the Management Reserve budget to the general operating budget in order to conceal cost overruns. This resulted in the government's awarding Lockheed performance bonuses for which it was not qualified.

These allegations are also included in the central findings of the November 19, 2007 DCMA report—and subsequently in the GAO report. In the executive summary, DCMA lists the significant findings, including that Lockheed "use[d] management reserve funds to

alter its own and subcontractor performance levels and cost overruns." Lockheed App. [80] 91.[4] DCMA ultimately concluded that Lockheed "failed to demonstrate proper use of [the management reserve] budget . . . and misapplied [management reserve] budgets . . . solely for the purpose of keeping the cost performance index (CPI) from worsening." *Id.* at 33. These conclusions are more than substantially similar to Solomon's primary claims: they are virtually identical.

Solomon's principal argument in response is that his claims cannot have been based on the public reports because he alleges that the opposite is true: the public reports were based on *his* knowledge and assistance. But this misunderstands the question before the court. The question is not whether Solomon actually derived his allegations from the public disclosures but whether he "*could have* produced the substance of the complaint merely by synthesizing the public disclosures' description of a scheme." *Shell*, 690 F.3d at 293 (emphasis added).

Solomon also maintains that he submitted additional evidence that was not included in the DCMA report, including the Memorandum, which he alleges is a smoking gun showing a conspiracy between Northrop and Lockheed to defraud the government. This new evidence is likewise insufficient to avoid the jurisdictional bar. The only new information in the Memorandum concerns the conspiracy allegations, not the underlying false claims

---

[4]Due to the number of filings that relate to the two pending summary judgment motions, the court for clarity will identify in brackets the docket number of the brief, or appendix, or other pleading cited. In this instance, for example, the docket number of the cited appendix is 80.

allegations.

Solomon has failed to produce sufficient summary judgment evidence to create a genuine issue of material fact concerning whether counts I through VI are based on the public disclosures that defendants rely on to invoke the "public disclosure bar" or "jurisdictional bar."

C

Nor has Solomon produced sufficient summary judgment evidence to create a genuine issue of material fact concerning whether he is an "original source" of the information contained in the DCMA report. *See* 31 U.S.C. § 3730(e)(4)(A) (2006). "To qualify [as an original source], a relator must have direct and independent knowledge of the allegations underlying his complaint, and also must have voluntarily provided the information to the Government." *Shell*, 690 F.3d at 294 (quoting 31 U.S.C. § 3730(e)(4) (2006)). It is undisputed that Solomon provided multiple items of information to the government. As evidence of his original source status, Solomon points to his surveillance reports between 2005 and 2007, his advising the DCMA review team how to investigate the Fort Worth facility, and the Memorandum he discovered after his reassignment. But the court need not determine whether Solomon's knowledge of the information he provided was "direct and independent" because Solomon has failed to create a genuine issue of material fact regarding whether his disclosures were voluntary.

To raise a genuine fact issue concerning the voluntariness of his disclosures, Solomon must submit evidence that would permit a reasonable trier of fact to find that he acted with

- 10 -

freedom from compulsion that would constrain his choice. *See Shell*, 690 F.3d at 294; *see also United States* ex rel. *Fine v. Chevron, U.S.A., Inc.*, 72 F.3d 740, 743-744 (9th Cir. 1995) (en banc).[5] Defendants' primary argument is that Solomon was constrained by the duties of his employment, so any disclosure was involuntary. Solomon made disclosures both during and after his involvement with the JSF Program, so the court will consider them separately.

D

1

Solomon's primary disclosures arose from his repeated surveillance audits—and subsequent reporting to the government—while working as Northrop's EVMS specialist. In his complaint, Solomon alleges that "his responsibilities included performing 'surveillance audits' of Northrop's EVM System." Compl. 5. He maintains, however, that he was not obligated to disclose the results of his audits to the government because he was not a government employee. Instead, he contends that he was a "paradigmatic whistleblowing insider" who reported fraud committed by his own employer. P. Resp. Br. to Northrop Mot. [91] 46 (internal quotation marks omitted).

---

[5]Solomon contends that *Shell* declared that only disclosures by someone "employed specifically to disclose fraud" are nonvoluntary. P. Resp. Br. to Northrop Mot. [91] 44. The court disagrees. In determining whether a government auditor could voluntarily disclose, the court wrote: "the fact that a relator was employed specifically to disclose fraud is sufficient to render his disclosures nonvoluntary." *Shell*, 690 F.3d at 294 (citations and internal quotation marks omitted). But this is not a conclusion that only this situation would render a disclosure nonvoluntary, as Solomon maintains. Instead, the court recognized that a government employee employed to disclose fraud would, by definition, be compelled to report to the government. *See id.* In this context, the compulsion to report is the critical trait of a nonvoluntary disclosure. *Id.*

No reasonable trier of fact could agree with Solomon's view of the evidence. The 2006 and 2007 plan agreed upon by Northrop and DCMA required that Northrop "[p]rovide timely indications of actual and/or potential problems," and that the "required external cost and schedule reports . . . [c]ontain information that depicts actual conditions." Northrop App. [85] 124-25. As the surveillance monitor for Northrop, Solomon was responsible to implement the plan. Although it may have been Solomon's primary duty to ensure that the project met costs and performance goals, this does not alter the fact that Solomon had an affirmative duty as a Northrop employee to report to the government any EVMS fraud that he uncovered.

Despite his contention to the contrary, Solomon has not created a genuine fact issue concerning whether he was an internal whistleblower whom the FCA "encourag[es] . . . to root out fraud." *Graham Cty. Soil & Water Cons. Dist. v. United States* ex rel. *Wilson*, 559 U.S. 280, 295 (2010). Solomon needed no encouragement because he was obligated under the terms of his employment to report his findings to the government. Because of this employment obligation, "[t]he incentive of a qui tam action as an anti-fraud device is lost and the putative relator's further participation in the government's investigation is necessarily fueled by other forms of self-interest." *United States* ex rel. *Paranich v. Sorgnard*, 396 F.3d 326, 341-42 (3d Cir. 2005).

2

Solomon also seeks to avoid the public disclosure bar based on these disclosures made after his reassignment from the JSF Program: a letter to Representative Henry Waxman

- 12 -

("Representative Waxman"); two letters to Senator John McCain ("Senator McCain"); documentation submitted to GAO "FraudNet;" and a letter to Katrina McFarland ("Secretary McFarland"), Assistant Secretary of Defense for Procurement. Except for the Memorandum, which he first provided to the government in 2011, Solomon's post-JSF Program disclosures contained substantially similar information and documents to his prior disclosures. As noted, the focus of an original source inquiry is whether the relator "has voluntarily provided the *information* to the Government." 31 U.S.C. § 3730(e)(4)(B) (2006) (emphasis added). Implicit in this requirement is that a given piece of information cannot be both voluntarily provided and involuntarily provided. It follows that once a relator involuntarily provides information to the government, he may not subsequently voluntarily provide the same information.

A reasonable trier of fact could only find that Solomon's post-JSF Program disclosures simply rehashed evidence that he had already submitted to the government in his role with the JSF Program. In letters to Representative Waxman[6] and Senator McCain,[7]

---

[6]For example, Solomon wrote to Representative Waxman:

> LM has been non-compliant with EVMS guidelines and with its internal procedures. The guidelines preclude a contractor from using Management Reserve (MR) to offset accumulated cost overruns. LM has reported cost overruns that were subsequently reduced by using MR. By doing so, it has managed the data and reports in order to obtain higher award fees and mask the real cost overrun. LM has also ignored an EVMS guideline by understating the most likely program Estimate at Completion (EAC).

- 13 -

Solomon summarized the allegations that were the focus of his surveillance report and this lawsuit. His letter to Secretary McFarland similarly was nothing more than a re-allegation of his claims to a different government audience.

Solomon contends that the post-JSF Program disclosure of the Memorandum is a prototypical voluntary provision. This position fails to consider the content of the Memorandum. Solomon submits the Memorandum as evidence both of cost concealment efforts—Counts I through VI—and of a conspiracy to conceal costs—Count VII. But the Memorandum cannot support either position. First, as noted above, a whistleblower cannot involuntarily disclose and subsequently voluntarily disclose information. Second, evidence of a conspiracy is irrelevant, because the conspiracy count cannot exist without underlying claims.

Accordingly, defendants are entitled to summary judgment dismissing counts I

---

P. Resp. App. to Lockheed Mot. [101-3] 516.

[7]Solomon's allegations in his first letter to Senator McCain closely resembled those made to Representative Waxman:

> Not surprisingly, NG failed to achieve their contractual targets and LM issued additional budget to NG. The award fee criteria between the JSF contracting officer and LM for certain periods provided for part of the award fee to be based on *improved* cost and/or schedule performance. After additional budget was transferred by LM from MR to NG, improved cost performance was reported in the CPRs. I am unable to determine if the contractors received higher award fees based on that reported, improved performance.

*Id.* at 522.

through VI.

V

The court now turns to count VII. Defendants are entitled to summary judgment dismissing count VII because secondary liability for conspiracy under § 3729(a)(3) cannot exist without a viable underlying claim. *See Pencheng Si v. Laogai Research Found.*, 71 F.Supp.3d 73, 98 (D.D.C. 2014) ("[T]here can be no conspiracy to commit fraud in violation of the FCA if an underlying false claim has not been adequately alleged."); *United States* ex rel. *Coppock v. Northrop Grumman Corp.*, 2003 WL 21730668 at *14 n.17 (N.D. Tex., July 22, 2003) (Fitzwater, J.). The FCA provides in § 3729(a)(3) that any person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid . . . is liable to the United States Government for a civil penalty[.]" Liability for conspiracy under the FCA is governed by traditional principles of civil conspiracy. *See United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991) (containing general discussion of civil conspiracy in FCA context). A claim for civil conspiracy is generally not viable without the commission of an underlying wrongful act:

> [C]onspiracy allegations, however, do not set forth an independent cause of action; instead, such allegations are sustainable only after an underlying tort claim has been established. *See Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983) ("Since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort."). In the context of the present case, for example, individuals alleging false arrest must prove that they were unlawfully arrested in order for their conspiracy claims to become cognizable.

*McCarthy v. Kleindienst*, 741 F.2d 1406, 1413 n. 7 (D.C. Cir. 1984); *see also K & S P'ship v. Cont'l Bank, N.A.*, 952 F.2d 971, 980 (8th Cir. 1991) (securities fraud case).  Therefore, in the instant case, where FCA conspiracy liability is based on an underlying claim that has been dismissed, the § 3729(a)(3) claim must also be dismissed.

\* \* \*

For the reasons explained, defendants' motions are granted, and this action is dismissed with prejudice by judgment filed today.

**SO ORDERED**.

December 12, 2016.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE